# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re Buca Inc. Securities Litigation                    Civil No. 05-1762 (DWF/AJB)

## MEMORANDUM
## OPINION AND ORDER

---

Avi Garbow, Esq., Daniel S. Sommers, Esq., Herbert E. Milstein, Esq., Matthew B. Kaplan, Esq., and Steven J. Toll, Esq., Cohen Milstein Hausfeld & Toll, PLLC; Bryan L. Crawford, Esq., Muria J. Kruger, Esq., and Stacey L. Mills, Esq., Heins Mills & Olson, PLC; Jay W. Eng, Esq., Michael J. Pucillo, Esq., and Wendy H. Zoberman, Esq., Berman DeValerio Pease Tabacco Burt & Pucillo; counsel for Plaintiffs.

Michael M. Krauss, Esq., and Wendy J. Wildung, Esq., Faegre & Benson, LLP, counsel for Defendants Buca, Inc., and Pete Mihaljov; Joseph T. Dixon, Jr., Esq., and Wesley T. Graham, Esq., Henson & Efron, PA, and Kenneth J. Walsh, Esq., McDonald Hopkins Co, LPA, counsel for Defendant Joseph Micatrotto; and Douglas R. Peterson, Esq., Monica L. Davies, Esq., and Todd A. Noteboom, Esq., Leonard Street and Deinard, PA, counsel for Defendant Greg A. Gadel.

---

## Introduction

This class-action lawsuit is before the Court pursuant to Defendants Buca Inc.'s ("Buca" or "the Company") and Pete Mihaljov's, Joseph Micatrotto's, and Greg Gadel's, (collectively, the "Individual Defendants") Motion to Dismiss the Consolidated Class-Action Complaint. In the Amended Complaint (the "Complaint"), Plaintiffs West Palm Beach Police Pension Fund, Steven Jones, Charles Booth, and James and Bert-Mary Brady, individually and on behalf of all other persons similarly situated (collectively, the "Plaintiffs") allege securities fraud against Buca and the Individual Defendants (collectively, the "Defendants") in violation of sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5

promulgated thereunder.  For the following reasons, Defendants' motion is granted, but the Court dismisses the Complaint without prejudice.[1]

## Background

Buca is a publicly-held company based in Minneapolis that owns and operates more than 100 "Buca di Beppo" and "Vinny T's of Boston" restaurants.  Micatrotto served as Buca's Chairman and Chief Executive Officer ("CEO") from July 1999 until May 10, 2004. Gadel served as Buca's Chief Financial Officer ("CFO"), Executive Vice President, Secretary and Treasurer from 2001 until December 2004.  Mihaljov served as Buca's Executive Chairman and CEO from May 10, 2004, until October 15, 2004.  Additionally, Mihaljov has served on Buca's Board of Directors since the Company's inception in 1993. Plaintiffs are investors who purchased Buca securities between February 6, 2001, and March 11, 2005 (the "Class Period").

---

[1]     Plaintiffs request that the Court take judicial notice of 11 documents, all pertaining to separate actions brought by the Securities and Exchange Commission ("SEC") and the United States Attorney's Office against Micatrotto, Gadel, and other individuals.  The documents include two civil complaints filed by the SEC, documents reflecting the settlement of one of the SEC actions, two criminal complaints brought by the U.S. Attorney's Office, and documents reflecting plea agreements in the criminal proceedings. Rule 201 of the Federal Rules of Evidence permits the Court to take judicial notice of a fact that is not subject to reasonable dispute.  Fed. R. Evid. 201(b).  A court may take judicial notice of SEC filings on a motion to dismiss, where the filings were required by law and were not offered to prove the truth of the documents' contents.  *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001).  Here, these documents, which are not SEC filings, are being offered to prove the truth of the matters asserted in them and are disputed by Defendants.  Accordingly, the Court finds that it is not appropriate to judicially notice these documents and therefore denies Plaintiffs' request.

Central to this case is a restatement that Buca issued on July 25, 2005 ("the July 25, 2005 Restatement").  In the July 25, 2005 Restatement, Buca announced that it would restate its annual financial statements for fiscal years 2000 through 2003 and its quarterly financial results for the first three quarters of 2004.  (*Id.* at ¶ 9.)  In the July 25, 2005 Restatement, Buca admitted that it incorrectly overstated its net income by 121.08%, 64.16%, and 47.77% for 2001, 2002, and 2003, respectively.  (*Id.* at ¶ 10.)  In pertinent part, the July 25, 2005 Restatement acknowledged that Buca:  (1) improperly booked free meals given to employees as sales; (2) improperly accounted for the Company's real estate leases and leasehold improvements; and (3) improperly capitalized certain other expenses, all in violation of GAAP.  (App. to Mem. in Supp. of Mot. to Dismiss Consolidated Am. Compl. ("Ex. List"), ¶ J, at F-12-15.)

Plaintiffs' securities fraud claim arises from numerous alleged material misstatements that Defendants made during the Class Period.  The alleged misstatements were made in various press releases and SEC filings in which Defendants announced the Company's financial results.  By restating those financial results in the July 25, 2005 Restatement, Buca admitted that certain portions of the press releases and SEC filings were incorrect.  And because Buca's reported financial results were incorrect, Plaintiffs claim that Buca's stock price was artificially inflated.  Additionally, Plaintiffs claim that the Individual Defendants' certifications of adequate internal controls that were required under the Sarbanes-Oxley Act, 15 U.S.C. § 7241, also constituted actionable misstatements. These certifications accompanied Buca's quarterly earnings statements and averred that the

certifying Individual Defendant had disclosed "all significant deficiencies in the design or operation of internal controls" and "any fraud, whether or not material, that involves management or other employees." (*Id.* at ¶ 101.)

Plaintiffs allege that when the July 25, 2005 Restatement was issued, the investing public "began to understand the magnitude of the fraud perpetrated by Defendants." (*Id.* at ¶ 10.) Although the July 25, 2005 Restatement was issued after the end of the Class Period, Plaintiffs contend that the alleged misrepresentations were "gradually disclosed" through a series of partial disclosures beginning in May 2004. (*Id.* at ¶ 192.) Based on these alleged partial disclosures, Plaintiffs assert that "the prior artificial inflation came out of the Company's common stock price." (*Id.*) As a result of their purchases of Buca common stock during the Class Period, Plaintiffs allege that they suffered economic loss. (*Id.* at ¶ 11.)

Plaintiffs contend that Defendants engaged in a fraudulent scheme to inflate revenues, reduce expenses, and conceal a decline in its comparable restaurant sales growth. (Compl. at ¶ 3.) To carry out these goals, Plaintiffs allege that Defendants engaged in a fraudulent accounting scheme by: (1) improperly accounting for free meals served to employees by booking them as sales; (2) improperly accounting for its restaurant leases; and (3) and improperly capitalizing expenses, all in violation of Generally Accepted Accounting Principles ("GAAP"). (*Id.*) Plaintiffs further allege that Buca lacked adequate internal controls in the accounting and finance areas and that Buca falsely represented that its internal controls were adequate and reliable. (*Id.* at ¶ 6.)

**Accounting for Employee Meals**

Plaintiffs allege that Defendants engaged in a scheme to boost comparable restaurant sales, a key indicator of growth, by fraudulently accounting for free employee meals as sales. (*Id.* at ¶ 31.) Plaintiffs contend that Buca's management used comparable restaurant sales as a performance indicator to trigger executive bonuses. (*Id.*) A former general manager of several Buca di Beppo restaurants from 1998 to 2002 and a confidential source in the case, CS-5, alleges that in early 2001 Micatrotto and Gadel directed each Buca di Beppo restaurant to begin booking free employee meals as sales. (*Id.* at 37.) CS-5 alleges that Micatrotto and Gadel directed each restaurant to book employee meals at roughly $100 per night, and to record the meals either as a "comped meal" or as having been paid by coupons or promotions. (*Id.*)

A former senior vice-president of operations from 1999 until April 2005, CS-8, alleges that he overheard conversations between Company executives in 2003 and 2004, including Micatrotto and Gadel, about the need to restate the revenue booked from employee meals. (*Id.* at 43.) Additionally, from April 2001 until April 2002, CS-5 allegedly repeatedly questioned both Micatrotto and Gadel about the booking of employee meals and specifically asked why the recognition of this revenue was not disclosed in the Company's public filings and investor reports. (*Id.* at 39.) CS-5 allegedly questioned Gadel at least 10 times during this period and was told by Gadel that the failure to disclose this revenue recognition was the result of "an executive decision" and "not to worry about it." (*Id.*)

5

Plaintiffs allege that the material impact of booking the employee meals had the effect of boosting the Company's revenues, rather than impacting the Company's income. (*Id.* at ¶ 177.)  Plaintiffs further allege that the practice allowed each store to appear to have increased sales of at least $700 per week when compared with same store sales for the same week the prior year.  (*Id.*)  Thus, according to Plaintiffs, this accounting practice resulted in the appearance of increased sales of between $2 and $7.4 million per year between 2000 and 2003 and more than $5 million in the first nine months of 2004.  (*Id.*)

Plaintiffs allege that the increased sales had the greatest impact during the first year, from the first quarter of 2001 to the first quarter of 2002.  (*Id.* at ¶ 178.)  During that period, Plaintiffs contend that same store sales appeared to be increasing.  (*Id.*)  Plaintiffs also claim that during that period, Buca's stock price reached more than $25 per share. (*Id.*)  Plaintiffs allege that Micatrotto and Mihajlov sold shares of Buca stock in June 2002 at $18.25 per share.  (*Id.* at ¶ 53.)  In particular, Plaintiffs allege that Micatrotto sold 100,000 shares, exhausting his holdings and earning $1,260,000.  (*Id.*)  Plaintiffs then allege that on July 17, 2002, shortly after those alleged insider sales, Micatrotto and Gadel announced during Buca's second quarter earnings call that comparable restaurant sales at its Buca di Beppo restaurants actually declined 1.3% in the quarter.  (*Id.* at ¶ 54.)  Plaintiffs then allege that in response to this announcement, the Company's stock dropped from $13.35 per share on July 16, 2002, to $9.26 per share on July 17, 2002.  (*Id.* at ¶ 55.)

In a February 7, 2005 Press Release ("the February 7, 2005 Press Release"), Buca announced that it was discontinuing its practice of booking free meals given to employees

as sales and expenses. (Ex. List, ¶ C.) On February 11, 2005, in a Form 8-K ("the February

11, 2005 Form 8-K"), Buca announced that its prior practice of including revenue from its

employee meals violated GAAP and indicated that all such revenue would need to be

removed from its consolidated financial statements. (*Id.* at ¶ 173.) The July 25, 2005

Restatement, in which Buca restated its financial results for 2000 through 2003 and the

first three quarters in 2004, reduced Buca's total sales by approximately 2% for each year

as a result of these accounting violations. (*Id.* at ¶ 175.) The July 25, 2005 Restatement

explained that the practice of booking free employee meals as sales did not affect its net

income because sales were always offset by expenses in the same amount. (*Id.* at ¶ 176.)

**Accounting for Leases and Leasehold Equipment**

Plaintiffs also allege that Buca's accounting treatment of its real estate leases and

leasehold equipment were part of its alleged fraudulent scheme to inflate Buca's stock. (*Id.*

at ¶ 3.) Buca leases both the land and the building at the majority of its restaurant locations.

(*Id.* at ¶ 44.) Most of Buca's leases contain options to renew for additional periods of

time. (*Id.*) Plaintiffs contend that Buca's practice was to amortize its leasehold

improvement and other lease expenses over the course of the entire lease, including all

renewal option periods, thereby reducing current expenses and increasing net earnings. (*Id.*

at ¶¶ 45–46.) A former accounting manager for Buca, CS-3, alleges that the Company's

policy was to "amortize leasehold improvements over the term of the lease plus two

extensions." (*Id.* at ¶ 49.)

In the February 7, 2005 Press Release, Buca announced that it was reviewing its

accounting treatment of real estate leases and leasehold improvements in light of recent developments in industry accounting practice.  (Ex. List, ¶ C.)  Buca's accounting treatment violated GAAP standards for lease accounting, which require that in the amortization of leasehold improvements, an operating lease should be amortized by the lessee over the shorter of their economic lives or the lease term.  (*Id.* at ¶ 159.)  In the February 11, 2005 Form 8-K, Buca announced that it had incorrectly applied the accounting rules with respect to certain operating lease transactions.  (*Id.* at ¶ 144.)  Buca also stated that it would restate its previously filed financial statements for fiscal years 1999 through 2003 and the first three quarters of 2004 to correct the GAAP violations.  (*Id.*)   Buca restated the financials in the July 25, 2005 Restatement.  (Ex. List, ¶ J at F-12-15.)

**Capitalization of Certain Expenses**

In the February 11, 2005 Form 8-K, Buca also announced that it had determined that its policies regarding capitalization of certain expenditures had not been properly applied and that it was reviewing capitalized amounts that should have been treated as repair and maintenance expenses.  (Ex. List, ¶ F at 3.)  Buca's capitalization practice violated GAAP because the expenditures lacked a future economic benefit or service potential.  (*Id.* at ¶ 163.)  In the July 25, 2005 Restatement, Buca announced that it had improperly capitalized expenditures including pre-opening expenses, décor warehouse expense and repairs and maintenance expenses, certain consulting fees, certain contributions to a conference, construction management expenses and capitalized interest, and had insufficient documentation to support fixed asset additions and dispositions.  (*Id.* at ¶ 164.)  The

restatement of these accounting violations resulted in a reduction of income of $11.9 million from 2000 through 2003 and the first nine months of 2004.  (*Id.*)

**Alleged Inadequacy of Internal Controls**

In addition to the alleged accounting scheme, Plaintiffs allege that Defendants' lack of adequate internal controls in the accounting and finance areas resulted in the alleged falsification of Buca's financial statements.  (*Id.* at ¶ 6.)  Plaintiffs allege that the Company's internal controls were so deficient that Micatrotto and Gadel, along with other senior Buca managers, fraudulently misused Company asserts for personal gain.  (*Id.* at ¶ 7.)  Specifically, Plaintiffs assert that in 2002, Micatrotto authorized Buca's purchase of an Italian villa for $279,000.  (*Id.* at ¶ 63.)  Plaintiffs further assert that Micatrotto authorized Buca to spend several hundred thousand dollars to renovate the villa.  (*Id.*)  Although Micatrotto authorized Buca to purchase and renovate the villa, Plaintiffs assert that it was later determined that Micatrotto and his wife were listed as owners on the property's title. (*Id.*)

Additionally, a former senior financial manager who worked at Buca's headquarters from July 2000 until February 2005, CS-9, alleges that during the Class Period, Micatrotto and Gadel often requested company checks for large sums of money without providing any supporting documentation or invoice.  (*Id.* at ¶ 60.)  CS-9 further alleges that several times Gadel asked for blank checks and responded to CS-9's protest by indicating that "it was not [CS-9's] concern."  (*Id.*)  CS-9 further alleged that Micatrotto requested and obtained Buca checks for non-company transactions, such as personal home improvements and family

gifts.  (*Id.* at ¶ 61.)

As further evidence that Buca's internal controls were inadequate, Plaintiffs allege that Gadel approved payment of invoices that were fraudulently submitted by a Buca vendor called EDP Computer Systems ("EDP") that provided Buca with computer-related services between 1998 and 2003.  (*Id.* at ¶ 66.)  Plaintiffs allege that Gadel had an undisclosed financial interest in EDP and authorized Buca to enter into financially unfavorable contracts and transactions with EDP in exchange for kickbacks to himself.  (*Id.* at ¶ 67.)  Further, Plaintiffs allege that Gadel and John Motschenbacher, a former Buca Senior Vice President and Chief Information Officer, started a computer-services company called High Wire Networks ("High Wire") using Buca funds.  (*Id.* at ¶¶ 68–69.) Further, Plaintiffs allege that Gadel and Motschenbacher authorized Buca to pay invoices to EDP that included the salaries of 10 High Wire employees.  (*Id.* at ¶ 70.)  According to CS-3, Gadel's response to questioning about Buca's lack of internal controls was to "laugh it off."  (*Id.* at ¶ 59.)

Plaintiffs allege that Micatrotto, Mihajlov, and Gadel all falsely certified the adequacy and reliability of the Company's internal controls.  (*Id.* at ¶¶ 19–21.)  Plaintiffs allege that Defendants' actions violated Item 308 of Regulation S-K, which requires management to assess the effectiveness of a public company's internal controls, identify material weaknesses, and disclose to the company's auditors any significant internal-control deficiencies.  (*Id.* at ¶ 75.)  Additionally, Plaintiffs allege that Defendants violated Item 404 of Regulation S-K, which requires that the company disclose any transactions to which it was a party where the amount of the transaction exceeds $60,000

and where any company director or executive officer had a direct or indirect material interest in such transaction. (*Id.* at ¶¶ 76–77.)

**Subsequent Investigations and Lawsuits**

In the second quarter of 2004, Buca's Audit Committee authorized an independent investigation regarding Micatrotto's purchase of the Italian villa. (*Id.* at ¶ 64.) In a press release dated May 10, 2004 ("the May 10, 2004 Press Release"), Buca accepted Micatrotto's resignation. (*Id.* at ¶ 139.) In the February 7, 2005 Press Release, Buca announced that the Audit Committee concluded that Micatrotto used Company funds for personal purposes without authorization. (Ex. List, ¶ D.) In the same release, Buca also announced that the SEC had issued a formal order of investigation to determine whether Buca had violated federal securities laws and that Buca believed the SEC's investigation was initiated by Micatrotto's resignation. (*Id.*) Additionally, Buca further stated in that release that it entered into a Separation Agreement with Micatrotto whereby Micatrotto agreed to make certain cash payments to Buca and to waive any rights to receive certain payments under the Buca employee share option plan. (*Id.*) The Separation Agreement was filed with the SEC on August 6, 2004. (Ex. List, ¶ H.) The filing also announced that Buca recouped approximately $900,000 from Micatrotto, who transferred title to the Italian villa to Buca. (*Id.*)

Once it became aware of such actions, Buca also conducted an internal investigation of Gadel and Motschenbacher's actions regarding EDP and High Wire. (*Id.* at ¶ 72.) On December 2, 2004, Buca issued a press release announcing Gadel's resignation, but the

reasons were not disclosed.  (*Id.* at ¶ 73.)  On July 25, 2005, Buca filed a civil lawsuit against Gadel and Motschenbacher in Hennepin County District Court alleging that the former executives had improperly used Buca to fund a computer-related services company that the executives had founded.  (*Id.* at ¶ 74.)

Plaintiffs allege that Buca's stock price declined as the truth was gradually disclosed.  In particular, Plaintiffs allege that following the May 10, 2004 Press Release announcing Micatrotto's resignation, Buca's stock price fell from $6.38 per share on May 7, 2004 to $5.24 per share on May 13, 2004.  (*Id.* at ¶¶ 141, 194.)  Further, Plaintiffs allege that following the February 7, 2005 Press Release announcing that the SEC had initiated a formal investigation to determine whether Buca had violated federal securities laws, Buca's stock price fell from $6.91 per share on February 7, 2005 to $6.75 per share on February 8, 2005.  (*Id.* at ¶¶ 142-43.)

Finally, Plaintiffs allege that the price of Buca's stock fell after a press release was issued on March 11, 2005 ("the March 11, 2005 Press Release") from $7.00 per share on March 11, 2005 to $ 6.50 per share on March 14, 2005.  (*Id.* at ¶ 145.)  In the March 11, 2005 Press Release, Buca announced that it would notify the SEC of the Company's need to delay the filing of its 2004 Form 10-K in order to complete work on previously announced restatements for fiscal years 2000 through 2003.  (*Id.*)  Buca also announced that Motschenbacher and Buca's Controller and Interim CFO, Dan Skrypek, had been suspended and were being reviewed for termination.  (*Id.* at ¶ 145.)

On March 14, 2005, after the end of the Class Period, Buca announced that it would

not timely file its 2004 Form 10-K.  (*Id.* at ¶ 147.)  Buca explained that the late filing

would be due in part to ongoing work on the Company's restatements, review of its financial

reporting policies and procedures, internal investigation of matters relating to the

Company's recent suspension of two executive officers, and review of internal controls.

(*Id.*)  Two days later, Buca issued a press release announcing that the Company had

terminated the employment of Motschenbacher and Skrypek.  (*Id.* at ¶ 148.)  Plaintiffs

allege that the Individual Defendants falsely approved the press releases and SEC filings.

(*Id.* at ¶¶19–21.)

Defendants move to dismiss the Complaint on two primary grounds:  (1) failure to

sufficiently plead loss causation and (2) failure to allege with particularity facts giving rise

to a strong and reasonable inference that any Defendant acted with scienter.  Additionally,

with respect to Plaintiffs' claims regarding Defendant's accounting treatment of employee

meals, Defendants contend that the alleged representation is immaterial and that these

claims should therefore be dismissed.

## Discussion

## I.      Standard of Review

Generally speaking, in deciding a motion to dismiss, the Court must assume all facts

in the complaint to be true and construe all reasonable inferences from those facts in the

light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir.

1986).  However, in the context of a case raising claims of securities fraud on behalf of a

class, the Court must also consider the complaint in light of the heightened pleading

standard established by the Private Securities Litigation Reform Act ("the Reform Act"), 15

U.S.C. §§ 78u-4 and 78u-5.  Under 15 U.S.C. § 78u-4(b)(2), a complaint must "state with

particularity facts giving rise to a strong inference that the defendant acted with the required

state of mind."  As such, the Court must "disregard 'catch-all' or 'blanket' assertions that do

not live up to the particularity requirements of the statute."  *Green Tree*, 270 F.3d at 660.

And, while a plaintiff is generally entitled, under Fed. R. Civ. P. 12(b)(6), to all reasonable

inferences that may be drawn from the complaint, a claim of securities fraud can only

survive if the allegations "collectively add up to a strong inference of the required state of

mind."  *Id.*

## II.     Section 10(b) Claim

Plaintiffs allege that Defendants[2] violated section 10(b) of the Exchange Act.  Rule

10b-5, promulgated by the SEC under its section 10(b) authority states:

> It shall be unlawful for any person, directly or indirectly, by the use of
> any means or instrumentality of interstate commerce or of the mails, or of
> any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state
> a material fact necessary in order to make the statements made, in light of the
> circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person in connection

---

[2]     Plaintiffs' section 10(b) arguments interchange Buca and the Individual Defendants.
Therefore, when the Court dismisses claims against Buca, it also dismisses the same claims
against the Individual Defendants and vice versa.

14

with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  In order to bring a successful claim of securities fraud, a plaintiff

must establish the following elements:  (1) material misrepresentations or omissions;

(2) made with scienter; (3) in connection with the purchase or sale of securities; (4) upon

which plaintiff relied; and (5) that proximately caused plaintiff's injuries.  *Alpern v.*

*UtiliCorp United, Inc.*, 84 F.3d 1525, 1533–34 (8th Cir. 1996) (citing 17 C.F.R.

§ 240.10b-5 (2001)).  The first (material misrepresentation), second (scienter), and fifth

(loss causation) elements are at issue in this case.  The Court will address loss causation

first because it alone is dispositive of this case.

## A.      Loss Causation

The Defendants first contend that the Complaint should be dismissed because

Plaintiffs have failed to sufficiently plead loss causation.  As stated above, a securities fraud

complaint must allege loss causation, which means "a causal connection between the

material misrepresentation and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336,

342 (2005).  In *Dura*, the Supreme Court held that a plaintiff cannot satisfy section 10(b)'s

loss causation requirement by alleging that the purchase price was inflated because of the

claimed misrepresentations.  *Id.* at 345.  Instead, a plaintiff must allege that the share price

fell significantly after the truth became known.  *Id.* at 347.  Plaintiffs need not plead loss

causation with particularity; rather, a short and plain statement in accordance with Federal

Rule of Civil Procedure 8(a)(2) is sufficient.  *See id.* at 346.

In the Complaint, Plaintiffs allege that when the alleged "misrepresentations and omissions were gradually disclosed through a series of partial disclosures beginning with Micatrotto's resignation, Buca's common stock declined as the prior artificial inflation came out of the Company's common stock price." (Compl. at ¶ 192.)  Plaintiffs point to four alleged partial disclosures during the Class Period that they claim demonstrate loss causation:  (1) the May 10, 2004 Press Release announcing Defendant Micatrotto's resignation; (2) the February 7, 2005 Press Release concerning the SEC investigation of Buca; (3) the February 11, 2005 Form 8-K disclosing the internal review of accounting policies and preliminary determination of GAAP violations; and (4) the March 11, 2005 Press Release concerning the need to delay filing the 2004 10-K.  Additionally, Plaintiffs contend that in response to these four alleged partial disclosures, the Complaint identifies three separate declines in Buca's stock value.

Specifically, the Complaint alleges that Buca's stock price declined 17.8% from its May 7, 2004 closing price of $6.38 per share to $5.24 per share on May 13, 2004, following the May 10, 2004 Press Release announcing Micatrotto's resignation as Chairman and CEO.  (Compl. at ¶ 141.)  The Complaint also specifies that Buca's stock price declined 2.3% from its February 7, 2005 closing price of $6.91 per share to a closing price of $6.75 per share on February 8, 2005, following the February 7, 2005 Press Release announcing that the SEC had issued a formal order of investigation to determine whether or not Buca had violated federal securities laws.  (*Id.* at ¶ 143.)  Finally, the Complaint specifies that Buca's stock price declined 7.1% from its March 11, 2005

closing price of $7.00 per share to a closing price of $6.50 per share on March 14, 2005. (*Id.* at ¶ 146.)   Plaintiffs allege that this last decline in Buca's stock price followed two alleged partial disclosures—the February 11, 2005 Form 8-K stating that Buca had incorrectly applied the accounting rules with respect to certain operating lease transactions and that Buca would restate its previously filed financial statements for the fiscal years 1999 through 2004 and the March 11, 2005 Press Release announcing that Buca would file a notification with the SEC regarding the Company's need to delay the filing of it annual report for the year ended December 26, 2004.

In response, Defendants contend that Plaintiffs have not identified any disclosure of the alleged fraud that is connected to a significant drop in share price.  Defendants note that the Complaint alleges "[w]hen the truth about BUCA's financial statements was revealed in July 2005, the investing public began to understand the magnitude of the fraud perpetrated by Defendants."  (*Id.* at ¶ 10.)  But Defendants further note that the Class Period ended more than four months earlier, in March 2005, before Buca issued the restatement that gave rise to this suit.  Thus, according to Defendants, because the Class Period ended before the disclosures that Plaintiffs identify as unveiling the "truth," they have not properly alleged loss causation.  Defendants suggest that Plaintiffs decided not to extend the Class Period to July 25, 2005, when the restatement disclosing the financial amounts was issued, because on July 26, 2005, Buca's share price actually increased from $5.34 to $6.25 per share.

Additionally, Defendants contend that Plaintiffs' assertion that the alleged misrepresentations were gradually disclosed beginning with Micatrotto's resignation in

May 2004, also fails to sufficiently plead loss causation.  At the outset of this argument, Defendants explain that Buca's share price was mostly declining throughout the Class Period.  Although Buca stock traded at a high of $25.15 during the Class Period on May 30, 2001, by May 7, 2004—three days before Micatrotto's resignation was announced and the gradual disclosures allegedly began, Buca's share price was already down to $6.38 per share.  Specifically, Defendants contend that each of the four alleged partial disclosures of fraud that Plaintiffs cite either did not disclose the alleged fraud or did not lead to a drop in Buca's share price.

The Court finds that Plaintiffs have not sufficiently pleaded loss causation under *Dura*.  Here, the May 10, 2004 Press Release announcing Micatrotto's resignation mentioned no investigation or accounting issues and thus disclosed nothing of the alleged fraud.  Indeed, the Complaint notes that "[t]he Company did not elaborate on the reason(s) for the resignation except to state that the Board and Defendant Micatrotto agreed that it was time for a management change."  (Compl. at ¶ 139.)  Thus, even though the May 19 Press Release was followed by a drop in stock price, the press release did not disclose the alleged fraud.  Next, although February 11, 2005 Form 8-K constituted a partial disclosure of the alleged fraud, Plaintiffs failed to identify a significant price drop in share price following this partial corrective disclosure.  Rather, Buca's share price increased from $6.91 on February 7, 2005, to $6.96 on February 14, 2005.  (Ex. List, ¶ K.)  Finally, although Buca's share price dropped on March 14, 1005, following the March 11, 2005 Press Release, that press release did not constitute a corrective disclosure. Rather, the

March 11, 2005 Press Release stated only that Buca's 2004 Form 10-K would be delayed to complete the previously-announced restatements and that two officers had been suspended.  Thus, the March 11, 2005 Press Release did not disclose the alleged fraud.

That leaves the Court with the February 7, 2005 Press Release announcing the SEC investigation.  Although Plaintiffs identify a drop in Buca's stock price from $6.91 per share on February 7, 2005, to $6.75 per share on February 8, 2005, the Court does not find that this one drop sufficiently pleads loss causation.  This single identification of a drop in Buca's stock price following a partial corrective disclosure negates Plaintiffs' allegation that the fraud was gradually disclosed through a series of partial disclosures.  Further, the Court does not find that this decline establishes loss causation where the share price was trending downward throughout the Class Period and was already down to $6.38 per share three days before Micatrotto's resignation was announced and the alleged fraud was allegedly gradually revealed.  The fact that Buca's stock price was already down to $6.38 by the time the fraud was allegedly revealed and the artificial inflation allegedly came out of the stock reveals that other factors had caused the decline.  Thus, even applying a notice pleading standard, Plaintiffs' allegations will not suffice.  Drawing all favorable inferences in Plaintiffs' favor, the Court cannot find sufficient allegations of loss causation required by *Dura*.  Although the Complaint should be dismissed on the basis that Plaintiffs have failed to sufficiently plead loss causation, the Court nevertheless addresses the remaining disputed elements.

### B.    Material Misrepresentation

19

Next, Defendants contend that, as a matter of law, Plaintiffs have failed to allege the materiality of the misrepresentations regarding Buca's accounting treatment of employee meals. Therefore, Defendants contend that Plaintiffs' claims based on Buca's accounting treatment of employee meals should be dismissed.  A misrepresentation or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).  In many cases, the question of materiality is a factual question for a jury to decide.  *Id.*  In those cases where the alleged misrepresentation could not have swayed a reasonable investor, a court may determine, as a matter of law, that the alleged misrepresentation is immaterial.  *Id.* (citation omitted).

Defendants contend that the fact that the treatment of employee meals represented only about 2% of Buca's total sales for fiscal years 2000 through 2003 and for the first nine months of 2004 renders this claim immaterial as a matter of law.  In particular, Defendants contend that because Buca reported a 43% increase in sales for the first quarter of 2002 as compared to the first quarter in 2001, when the practice allegedly had the greatest impact, the 2% increase attributable to employee meals was negligible. Defendants also contend that the alleged negligible impact is evident when considering Buca's year-end total sales.  For example, Defendants note that Buca reported a 38% sales

20

increase in fiscal 2001 compared to fiscal 2000 and a 37% increase in fiscal 2002 compared to the prior year.  (Compl. at ¶¶ 90, 103.)  In response, Plaintiffs assert that the increases Defendants cite represent total sales, not same store sales.  According to Plaintiffs, when only same store sales are considered, a 2% increase over the prior year has a material effect on revenues.

The Court does not find that a 2% increase in total sales is immaterial as a matter of law.  The Court cannot tell whether a representation was immaterial as a matter of law solely by considering the amount of the revenue overstatement.  *See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003) ("In our view, the quantity of a revenue overstatement, in and of itself, is not sufficient to be dispositive of this issue.  Instead, we look at the total mix of data available to investors, and place the misrepresented data in context.")  Thus, reading the allegation in the light most favorable to the Plaintiffs, a reasonable factfinder could determine that a 2% increase in total sales is material.  Therefore, the Court denies Defendants' motion with respect to this issue.

### C.      Scienter

Finally, Defendants contend that the Court should dismiss the Complaint because the Plaintiffs have failed to plead facts giving rise to a strong inference that Defendants acted with scienter.  Scienter is "the intent to deceive, manipulate, or defraud."  *Green Tree*, 270 F.3d at 653 (citations omitted).  Plaintiffs must plead facts giving rise to both a reasonable and strong inference of scienter.  *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003).  There are three ways in which Plaintiffs can satisfy the scienter requirement:

21

(1) by pleading specific facts demonstrating "the intent to deceive, manipulate, or defraud"; (2) by pleading specific facts giving rise to the level of "severe recklessness"; or (3) by pleading allegations of "unusual or heightened" motive or opportunity.  *In re K-Tel Int'l, Sec. Litig.*, 300 F.3d 881, 893–94 (8th Cir. 2002).

Plaintiffs allege that they have satisfied all three ways of establishing a strong and reasonable inference of scienter.  Additionally, Plaintiffs allege that they have satisfied the scienter requirement with regard to their inadequate internal-controls claim.  The Court will address each argument in turn.

### 1.      Intent

Plaintiffs assert that they have pleaded facts that show Defendants knew that their earnings statements were materially false and misleading when made because they knew that their accounting methods violated GAAP.  The Court will address Plaintiffs' argument with respect to each of the three accounting violations.

**The Claims Based On Buca's Accounting Treatment of Employee Meals**

Defendants contend that Plaintiffs have failed to plead facts that show Defendants knew they were improperly accounting for employee meals during the Class Period. Plaintiffs point to the statements of several confidential sources to support their allegations of scienter.  First, Plaintiffs note that the Complaint alleges that from April 2001 to April 2002 CS-5 "repeatedly questioned" Micatrotto and Gadel "about the booking of the '[Employee] Meals' and why the recognition of this revenue was not disclosed in the Company's public filings and investor reports."  (Compl. at ¶ 39.)  Further, Plaintiffs point

out that the Complaint alleges that CS-5 questioned Gadel about this at least 10 times and was told that the failure to disclose this revenue recognition was a result of an "executive decision" and that he "should not worry about it."   (*Id.*)

Additionally, Plaintiffs note that the Complaint alleges that CS-4 stated that in the first quarter of 2004, CS-4 and other general managers received a voice-mail message from Micatrotto and Gadel instructing them that they were no longer allowed to book the employee meals as sales.  Further, Plaintiffs point out that CS-4 alleges that the Company continued to book employee meals as revenue through the third quarter of 2004, and, when the practice stopped, Buca did not timely disclose this accounting change.  Finally, Plaintiffs note that the Complaint alleges that CS-8 recalled conversations between Buca executives in 2003 and 2004, including between Micatrotto and Gadel, regarding the need to restate the revenue booked from employee meals.  In response, Defendants contend that the Complaint's only allegations of contemporaneous knowledge of wrongdoing are the vague generalizations of confidential sources in no position to discern the Defendants' motives.

The Court finds that Plaintiffs have failed to plead facts giving rise to a reasonable and strong inference of scienter.  Allegations of GAAP violations do not, by themselves, raise an inference of scienter.  *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851, 855 (8th Cir. 2005).  Instead, such allegations may only be sufficient when coupled with evidence of corresponding fraudulent intent.  *Id.*  Thus, plaintiffs must allege "facts or further particularities that, if true, demonstrate that the defendants had access to, or

knowledge of, information contradicting their public statements when they were made." *Navarre*, 299 F.3d at 742.  Although Defendants practice of booking free employee meals violated GAAP, Plaintiffs have failed to establish the requisite fraudulent intent.

Here, the confidential sources are silent regarding whether the Individual Defendants knew or believed that the practice of booking employee meals as sales violated GAAP. Although the Complaint alleges that CS-5 repeatedly questioned Gadel about Buca's decision not to publicly disclose its practice of booking employee meals as sales, CS-5 does not allege that Gadel knew or believed the practice violated GAAP.  Further, although CS-4 alleges that Micatrotto and Gadel instructed general managers to stop booking employee meals as sales, CS-4 dos not allege that Micatrotto or Gadel knew that the practice violated GAAP.  Likewise, although CS-8 alleges that in 2003 and 2004 executives discussed the need to restate the revenue booked as employee meals, CS-8 does not allege that any executive actually concluded that the restatement was required or that Buca or any of the Individual Defendants adopted this view before 2005.  In conclusion, the Court finds that the confidential sources' allegations do not establish the requisite fraudulent intent that would establish scienter.  Accordingly, these claims are dismissed on this basis.

**The Claims Based on Buca's Accounting for Leases and Leasehold Equipment**

Defendants contend that Plaintiffs' claims based on Buca's accounting for leases and leasehold improvements should be dismissed because Plaintiffs have failed to satisfy the scienter requirement.  Defendants contend that Buca employed an accounting treatment that had been widely used in the restaurant business until the SEC clarified its interpretation of

the governing rules in early 2005.  Defendants contend that Plaintiffs have failed to raise a strong inference of scienter because the Complaint alleges only that the original accounting treatment of leases and leasehold improvements violated GAAP and required restatement. Defendants contend that Plaintiffs fail to allege that anyone at Buca knew or believed that the accounting treatment was improper at the time the original financial results were posted.

In response, Plaintiffs refute Defendants' assertion that Buca employed an accounting treatment that had been widely used in the restaurant business until the SEC clarified its interpretation of the governing rules in early 2005.  Plaintiffs' response fails to address the relevant inquiry.  Specifically, Plaintiffs fail to allege the requisite fraudulent intent coupled with the GAAP violation.  Here, there is no allegation that anyone at Buca knew or believed that the lease accounting method violated GAAP at the time of the original filings.  Because Plaintiffs have failed to plead such facts, Plaintiffs have failed to meet the scienter requirement with regard to their claims based on Buca's accounting for leases and leasehold equipment. Accordingly, these claims are dismissed on this basis.

**The Claims Based on Buca's Capitalization of Other Expenses**

Defendants also assert that Plaintiffs' claims based on Buca's alleged improper capitalization of other expenses should be dismissed because Plaintiffs have failed to satisfy the scienter requirement.  Defendants contend that the Complaint generally alleges that Buca improperly capitalized various expenses that provide the Company with no future economic benefit or service potential.  As a result, Defendants allege that Plaintiffs have

25

failed to plead the circumstances of the alleged fraud with particularity.  In particular, Defendants contend that the Complaint pleads no facts demonstrating that anyone at Buca knew or believed that the capitalization of the expenses at issue was improper at the time the original financial results were posted.  Finally, Defendants contend that Plaintiffs have abandoned their claims based on Buca's alleged improper capitalization of other expenses because in their opposition brief Plaintiffs failed to respond to Defendants' arguments.

The Court does not find that Plaintiffs have abandoned these claims because Plaintiffs mention them in their opposition brief's "statement of facts" and because Plaintiffs denied abandoning them at oral argument.  The Court, however, finds that Plaintiffs have failed to establish scienter with regard to these claims.  Plaintiffs fail to plead any fact demonstrating that Buca knew or believed the capitalization was improper at the time the original financial results were announced.

### 2.    Unusual or Heightened Motive

Next, Defendants assert that Plaintiffs have failed to establish a strong and reasonable inference of scienter based on an unusual or heightened motive to commit fraud.  Plaintiffs contend that Defendants were motivated to allegedly artificially inflate Buca's stock price in order to:  (1) sell stock and exercise their stock options at a substantial profit and (2) increase their compensation and bonuses.

### a.    Stock Sales and Options

Plaintiffs allege that the Individual Defendants were motivated to inflate Buca's stock price in order to sell their shares at inflated prices and to exercise their options using

inflated stock as currency.  Plaintiffs contend that following a May 15, 2002 press release

in which Buca reported positive comparable restaurant sales for the Buca di Beppo

restaurants, Micatrotto sold 100,000 Buca shares for approximately $1,260,000 on June

12, 2002.  Plaintiffs contend that this sale constituted 100% of Micatrotto's holdings in

Buca.[3]  Plaintiffs also contend that Mihajlov also sold 10,000 Buca shares for $180,000 on

---

[3]     Micatrotto refutes the assertion that his June 12, 2002 sale of 100,000 Buca shares
exhausted his holdings.  Micatrotto contends that this allegation is not supported by any
pleading, confidential source, or exhibit.  Micatrotto requests that the Court take judicial
notice under Rule 201 of the Federal Rules of Evidence of Buca's 2002 Schedule 14A
Proxy Statement, filed with the SEC on April 25, 2002, and Buca's 2003 Schedule 14A
Proxy Statement, filed with the SEC on April 4, 2003.  These documents show that as of
April 9, 2002, Micatrotto was the beneficial owner of 301,663 Buca shares.  (Reply Mem.
of Def. Joseph P. Micatrotto in Supp. of Mot. to Dismiss Pls.' Consolidated Am. Compl.,
Ex. B. at 7.)  Thus, according to Micatrotto, by selling 100,000 shares, he only divested
himself of 33% of his holdings in Buca.  Micatrotto also asserts that these documents show
that by March 31, 2002, Micatrotto was the owner of 332,867 Buca shares.  (*Id.* at Ex. A. at
8.)  Micatrotto asserts that he offers these documents not to prove the truth of the
documents' contents, but rather to emphasize that Plaintiffs' allegations against Micatrotto
are disingenuous and lack a factual or legal basis.

        In response, Plaintiffs request that the Court take judicial notice of the Form 4 that
Buca filed with the SEC on June 12, 2002.  That Form, shows "0" securities beneficially
owned by Micatrotto following his sale of 100,000 shares of common stock.  Additionally,
Plaintiffs request that the Court take judicial notice of note 9 on page 8 of the 2002
Schedule 14A that Micatrotto requests judicial notice of, which shows that the "shares"
beneficially owned by Micatrotto actually consisted of options to purchase 301,663 shares,
not actual shares.  Finally, Plaintiffs request that the Court take judicial notice of note 11
on page 9 of the 2003 Schedule 14A submitted by Micatrotto, which states that the 332,867
shares beneficially owned by Micatrotto as of March 31, 2003 consisted of options to
purchase 324,997 shares of common stock and 570 shares owned by his wife.  Thus,
Plaintiffs do not object to Micatrotto's request for judicial notice.  The Court grants
Micatrotto's and Plaintiffs' requests to take judicial notice of the documents, finding that
the Court may appropriately consider these SEC filings on this motion to dismiss and that
they do not go to the truth of the matter asserted.  *See Green Tree*, 270 F.3d at 663.

June 4, 2002.  Plaintiffs contend that Micatrotto's and Mihajlov's sales occurred just prior to the Company's public announcement on July 17, 2002, that comparable restaurant sales had declined for the second quarter and thus constituted an insider stock sale.  Plaintiffs contend that this announcement resulted in the Company's stock price dropping from $13.35 per share on July 16, 2002, to $9.26 per share on July 17, 2002.  In addition to Micatrotto's and Mihajlov's July 2002 sales, Plaintiffs cite various stock sales made by Micatrotto, Mihajlov, and Gadel between 2000 and 2002, in which the Individual Defendants earned between $85,000 and $1,168,247 for the various sales.  Because these sales occurred during the Class Period, when Defendants were allegedly reporting false operating results, Plaintiffs assert that Defendants had a personal stake in sustaining the perception of the viability of Buca's rapid-growth plans.

Defendants, on the other hand, assert that the stock sales do not show the requisite motive because the Complaint does not indicate that Gadel's and Mihaljov's sales were out of line with their prior trading practices.  Defendants also contend that Micatrotto's June 2002 sale of 100,000 shares occurred early in the Class Period, before the price

drops of which Plaintiffs complain, and therefore do not establish motive to commit fraud. The Court agrees.

The Court finds that Plaintiffs have not sufficiently pled that the Individual Defendants had an unusual or heightened motive to commit the alleged fraud.  "Unusual insider trading activity during the class period may permit an inference of bad faith and scienter."  *K-Tel Int'l*, 300 F.3d at 895 (citation omitted).  But "[i]nsider stock sales are not inherently suspicious; they become so only when the level of trading is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'"  *Navarre*, 299 F.3d at 747 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1079, 1092 (9th Cir. 2002)).

Here, with respect to Gadel and Mihaljov, Plaintiffs' Complaint only alleges the number of shares each defendant sold and the gross profit realized for each stock sale during the Class Period.  Because the Complaint does not indicate how these sales relate to the Defendant's prior sales histories, the Court cannot determine whether the sales were "unusual in timing and amount."  *Id.* (finding no showing of unusual trade activity where "[t]he Class failed to allege the prior history of sales for the defendants or even the number of shares held by each").  With respect to Micatrotto's June 2002 sale of 100,000 shares, although noteworthy because this sale exhausted his holdings, this sale occurred early in the Class Period, before the price drops of which Plaintiffs complain.  Moreover, Gadel, who allegedly directed the accounting scheme with Micatrotto, did not sell any of his shares in June 2002.  Additionally, Plaintiffs cite no authority for the proposition that a single sale by

one executive supports a strong inference of scienter.  Thus, the Court finds that Plaintiffs failed to plead unusual or heightened motive that would give rise to a reasonable and strong inference of scienter.

### b.    Compensation and Bonuses

Plaintiffs next allege that the Individual Defendants were motivated to inflate their stock price to increase their compensation, which was directly tied to certain performance targets.  Plaintiffs contend that, pursuant to their Employment Agreements, Micatrotto and Gadel were eligible for bonuses ranging from 35% to over 60% of their base salary, depending on the number of new restaurant openings, total sales, comparable restaurant sales, and general and administrative expenses.  Plaintiffs further allege that Gadel's agreement used a 2% increase in comparable restaurant sales as a performance benchmark.  Thus, according to Plaintiffs, it is not coincidental that Defendants' alleged fraudulent booking of employee meals as revenue allegedly increased same store sales by more than 2% annually.

In response, Defendants assert that the Complaint only vaguely alleges that Micatrotto and Gadel were eligible for bonuses that were dependent on achieving certain performance targets, which is nothing unusual for an executive.  The Court agrees and finds that such allegations do not establish unusual or heightened motive to commit the alleged fraud.  "[U]nsupported allegations with regard to motives generally possessed by all corporate directors and officers are insufficient as a matter of law."  *K-Tel Int'l*, 300 F.3d at 894.  Such motives include the desire to maintain a high corporate credit rating or the

appearance of corporate profitability, and the desire to maintain a high stock price in order to increase executive compensation.  *Id.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d. Cir. 2001)).

Plaintiffs' allegations are unremarkable.  Plaintiffs have not pleaded any motive beyond what could be attributed to any corporate officer.  The Complaint is silent as to the amount of the bonuses that Micatrotto and Gadel received that resulted from increased sales.  Moreover, the Complaint is silent as to the total amount of the bonuses that Micatrotto and Gadel actually received.  Thus, Plaintiffs have not asserted the required "concrete and personal benefit to the individual defendants" that resulted from the alleged fraud.  *See K-Tel*, 300 F.3d at 894 (quoting *Kalnit*, 264 F.3d at 139).  Based on the foregoing, Plaintiffs have not alleged sufficient evidence to show that the Individual Defendants' compensation gives rise to a strong and reasonable inference of scienter.

### 3.    Severe Recklessness

Plaintiffs assert that the Complaint demonstrates severe recklessness when the specific allegations are viewed in their totality.  Plaintiffs may establish scienter through recklessness by demonstrating "highly unreasonable omissions or misrepresentations involving an extreme departure from the standards of ordinary care, and . . . present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *K-Tel Int'l.,* 300 F.3d at 893 (citations omitted).  Absent a showing of motive and opportunity, the remaining allegations against the defendants must be particularly strong to constitute an inference of

recklessness.  *Id.* at 894.

In particular, Plaintiffs contend that the magnitude of the restatement, the multiple

GAAP violations, and the alleged lack of internal controls collectively establish scienter.

The Court may consider allegations of scienter collectively.  *Green Tree*, 270 F.3d at 660.

After reviewing Plaintiffs' allegations, the Court is not persuaded that they establish severe

recklessness.  Plaintiffs lump all three GAAP violations together, suggesting that

Defendants engaged in a massive fraudulent accounting scheme, when the Complaint and

Plaintiffs' opposition brief focus almost exclusively on the accounting violations regarding

employee meals.  Particularized allegations regarding Defendants' capitalization of certain

expenses are conspicuously absent.[4]  The Court is not persuaded that the Plaintiffs'

allegations regarding the GAAP violations, taken together, establish scienter.  Furthermore,

these GAAP violations, viewed collectively with Plaintiff's allegations regarding the

magnitude of the restatement and the alleged inadequate internal controls also are

insufficient to give rise to a strong inference of scienter.

### 4.      Internal Controls

Additionally, Plaintiffs assert that Buca repeatedly misrepresented that its internal

controls were adequate and reliable and that these misrepresentations establish scienter.  In

particular, Plaintiffs allege that Buca's internal controls were so deficient that the Individual

---

[4]      Also conspicuously absent are any specific allegations of fraud related to Mihajlov.
Plaintiffs' Complaint and brief focus almost exclusively on Gadel and Micatrotto.  There is
not one allegation that Mihajlov knew that the various accounting practices violated GAAP

(Footnote Continued on Next Page)

Defendants and other senior Buca managers were able to misappropriate Company assets. Plaintiffs further assert that the Complaint alleges facts that establish that Buca's senior officers knew about the internal control problems.  Alternatively, Plaintiffs allege that even if the officers were unaware of the internal control problems, the weaknesses were so severe that the Defendants were reckless in not knowing.

In response, Defendants assert that inadequate internal controls do not give rise to an actionable claim for securities fraud under section 10(b).  Alternatively, Defendants contend that the Complaint fails to plead facts giving rise to a strong inference of scienter in connection with the allegedly deficient internal controls.  In support of this assertion, Defendants contend that Plaintiffs never specify which internal controls were deficient, how so, or when.  Further, Defendants contend that Plaintiffs mistakenly argue that the Buca executives' conduct in signing the Sarbanes-Oxley certifications vouching for Buca's internal controls, alone, give rise to an inference of scienter.  Defendants also contend that Plaintiffs never link the alleged deficiencies to the alleged accounting scheme.  Instead, Defendants assert that the Complaint compels the conclusion that Buca took numerous steps to address issues involving internal controls, including dismissing or accepting the resignation of certain officers, conducting internal investigations under the auspices of the Audit Committee, restating certain financials, and filing suit against two former officers in state court.

_____

(Footnote Continued From Previous Page)
at the time Defendants issued the misstatements.

"What impact a Sarbanes-Oxley certification has on a 10b-5 claim is a relatively novel question." *In re Watchguard Sec. Litig.*, 2006 WL 2038656, *9 (W.D. Wash. April 21, 2006) (dismissing plaintiffs' section 10(b) claim, but addressing plaintiffs' arguments that the certifications of adequate internal controls constituted actionable misstatements). At least one district court, however, has held that Sarbanes-Oxley certifications give rise to an inference of scienter. *In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006). That court held that, based on the pleadings, the executives' Sarbanes-Oxley certifications showed scienter because the certifications showed that the executives either knew that an employee was improperly changing accounting journal entries in order to artificially inflate revenue or that their financial controls were inadequate. *Id.* at *50.

Here, because the Court has already dismissed the Complaint based on Plaintiffs' failure to sufficiently plead loss causation, the Court does not need to reach the issue of whether inadequate internal controls give rise to an inference of scienter. Whether inadequate internal controls give rise to an actionable claim for securities fraud under section 10(b),[5] whether Plaintiffs can establish scienter with respect to Gadel and

---

[5]    The Court notes, however, that even if the allegation could establish an actionable claim, the Complaint would fail to establish scienter on this basis with respect to Mihajlov. There is no allegation that Mihajlov was aware of any inadequate internal controls when he signed the certifications. *See Higginbotham v. Baxter Int'l, Inc.*, 2005 WL 1272271, at *5 (N.D. Ill. May 25, 2005) (finding that plaintiffs had not pled scienter where they provided no specific allegations as to what the deficiencies in the controls were, nor provided any specific allegations as to the executives' awareness of those deficiencies).

Micatrotto, and whether Gadel and Micatrotto's actions are attributable to Buca are questions that the Court need not answer to rule on this motion.  In conclusion, the Court finds that Plaintiffs have failed to sufficiently plead loss causation and scienter.  Plaintiffs' section 10(b) allegations fail against Buca and the Individual Defendants as a matter of law. Accordingly, the Court dismisses Plaintiffs' 10(b) claims.

### III.    Section 20(a) Claim

Additionally, Plaintiffs allege claims against the Individual Defendants for violations of section 20(a) of the Securities Exchange Act.  "Section 20 of the Exchange Act extends liability for fraudulent conduct under Section 10(b) to individual controlling persons found to have committed securities fraud."  *In re Xcel Energy, Inc.*, 286 F. Supp. 2d 1047, 1059 (D. Minn. 2003) (citing 15 U.S.C. § 78t(a)).  Because Plaintiffs have failed to properly plead a section 10(b) claim, their section 20(a) claim must also be dismissed.  *See Parnes*, 122 F.3d at 550 n.12.

## Conclusion

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.      Defendants Buca and Mihajlov's Motion to Dismiss the Consolidated Amended Class Action Complaint (Doc. No. 36) is **GRANTED**.

2.      Defendant Micatrotto's Motion to Dismiss the Consolidated Amended Class Action Complaint (Doc. Nos. 41 and 49) is **GRANTED.**

3.      Defendant Gadel's Motion to Dismiss the Consolidated Amended Class Action Complaint (Doc. No. 32) is **GRANTED**.

4.      Plaintiffs' Request for Judicial Notice (Doc. No. 66) is **GRANTED**.

5.      Plaintiffs' Second Request for Judicial Notice (Doc. No. 67) is **DENIED**.

6.      The Consolidated Class Action Complaint (Doc. No. 27) is **DISMISSED WITHOUT PREJUDICE**.

7.      The Court **GRANTS** Plaintiffs' leave to replead.  If Plaintiffs elect to replead, they must file a second consolidated amended complaint within 45 days after entry of this Order.  The new complaint and any subsequent motion to dismiss should be abbreviated, focusing only on the deficiencies raised by the Court in this Order.


Dated:  October 16, 2006            s/Donovan W. Frank
                                    DONOVAN W. FRANK
                                    Judge of United States District Court